**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**JEFF R. DAVIS,**

      **Plaintiff,**

**vs.**                                **Case no. 5:05cv261-RS-ET**

**THE CITY OF PANAMA CITY, FLORIDA,**

      **Defendant.**

_____/

<u>ORDER</u>

      Before the Court is Defendant's Motion for Summary Judgment (Doc. 37), Plaintiff's Response (Doc. 43), and Defendant's Reply (Doc. 52). The Motion for Summary Judgment is granted.


<u>I. FACTS</u>


      Plaintiff Jeff R. Davis (Davis) is a black male employed by the Panama City Police Department (PCPD) from June 1, 1999 through February 9, 2005.  All PCPD employees are required to abide by the PCPD's Code of Conduct which contains a series of "General Orders." During his employment with the PCPD, Plaintiff received four "counseling memorandums" disciplining him for a variety of offenses including: alerting a suspect to the pending arrival of the police (May 5, 2000); damaging city property (October 10, 2000); violations of General Order 402 and Department Policy (June 26, 2003); and violation of General Orders 411 and 213 for failure to monitor radio and failure to back up an officer. Davis did not appeal any of these actions.

      On February 2, 2005, Police Chief John Van Etten ordered the PCPD's Professional Services Section to perform vehicle inspections on the entire fleet

beginning with the midnight shift which had reported to work at 8:00 P.M. Two officers collected the all the keys from the officers working that shift. The parties dispute whether Davis attempted to leave the meeting in order to get to his vehicle prior to turning over his keys to the inspectors. For purposes of this order, this factual dispute is not material.

Upon searching Davis' car, the investigating officers recovered a black cloth shaving bag which Davis used to store personal effects and work related items issued by the PCPD. The black cloth bag contained a crack cocaine pipe and a small plastic bag with two straws containing the residue of a powdery substance. The powdery substance was tested by the PCPD and the Florida Department of Law Enforcement (FDLE). Both of these entities confirmed that the powdery substance was cocaine.

After discovering the items in Davis' car, Davis was given his Miranda rights and voluntarily submitted to an interview, under oath, conducted by the PCPD in which he addressed how the cocaine residue, pipes, and straws appeared in his black box.

> About a week ago, couple of days ago, um, week,...while I was at my son's [house]...and uh laying' on the couch, they had some friends over, a bunch of people was comin' over. One of the females, I didn't ask what their name was, but she had some stuff in hand, she said one of her, her baby found at her apartment and she wanted to know what it was, if uh her boyfriend, I guess, was an ex-drug dealer and who's on probation and she wanted me to test it just to see what it as. I didn't ask what her name was, I said sure. I had my little baggie, bag that I normally have in my car sittin' there and I told her I said okay, put it in my bag, I will try and test it and I guess by that time, I might have been sleepy or whatever, I said if you'll just put it in there, I'll test it, and I'll let you know...if its, you know what it is. I just put some cobalt on it see if it is.

(Doc. 39, Ex. 1, Part 2, p.1009, lines 29-37).The identity of the woman who Davis claimed provided her with the cocaine, pipers, and straws remains shrouded under a cloak of mystery. The officers probed Davis regarding why he accepted the foreign substance in question from the woman without asking her for identification and determining what she was doing in Davis' son's house. Davis responded:

> There was no, that was bad on my part, you know, but I did it. 'Cause it was really no, like little bit of a white substance or whatever and _____, I

2

> didn't, I did not ask. I should've, I didn't ask. I didn't ask who she was, I didn't ask...When I am at their house, it's really least concerned with who's comin' in and out, you know, 'cause....

(Doc. 39, Ex. 1, Part 3, p.1018, lines 293-295, 298-299). During the same interview, Davis claimed that he simply forgot about the powdery substance in his bag, which is why he failed to adhere to the applicable PCPD procedures. In addition, Davis stated that the bag contained both personal effects and work related items and that he "seldomly" removed the bag from his car.

Davis could not recall the specific day the encounter with the unnamed woman occurred or whether he was coming or going to work on that day. Davis does recall that his uniform was laid out and pressed on the day in question and that he was on a four day off period. According to Davis, he usually worked for five days and then took off four days. (Doc. 39, Ex. 5, Part 2, p.81-82). It is undisputed that Davis worked the following schedule in the week preceding the date of the search:

| | |
|---|---|
| Wednesday, January 26 | 8:00 P.M.-7:00 A.M. |
| Thursday, January 27 | 8:00 P.M. -7:00 A.M |
| Friday, January 28 | 1:00 P.M.- 5:00 P.M. |
| Saturday, January 29 | 1:00 P.M. - 5:00 P.M. |
| Sunday, January 30 | Off |
| Monday, January 31 | Off |
| Tuesday, Feburary1 | 8:00 P.M.- 7:00 A.M. |

(Doc. 39, Ex. 10, ¶4). Logic dictates that Davis would have received the material prior to January 26 and had ample opportunity to turn it in prior to the inspection. In addition to submitting to an interview by the PCPD, Davis also voluntarily consented to take a drug test on February 3, 2005. Pending investigation of the incident, PCPD suspended Davis with pay, citing violations of the following PCPD infractions: 1) Failure to adhere to proper evidence procedures in violation of General Order 416.01; 2) failure to follow established procedures for the receipt and storage of property seized or found or held

as evidence in violation of General Order 416.00; 3) failure to meet reporting requirements in violation of General Order 426.00; and 4) failure to meet patrol officer duties and responsibilities in violation of General Order 411.00.

On February 9, 2005, prior to the formal completion of the investigation, Davis was terminated by Chief Van Etten for failing to adhere to General Orders 411.00, 416.00, 416.01, and 426.00. Prior to terminating Davis, Chief Van Etten confirmed that Davis' drug test results came back negative for all drugs tested, including cocaine. While Chief Van Etten claims that Davis also violated General Order 207.00 (Code of Conduct) and Florida Statutes §§ 893.035 (possession of a controlled substance) and 893.147 (use or possession of drug paraphernalia), Davis' termination letter, dated February 11, 2005, did not indicate that Davis violated any state statute or General Order 207.00. (Doc. 39, Ex. 1, p. 2932). Rather, after recounting the violations of the General Orders 411.00, 416.00, 416.01, and 426.00, the termination letter stated, in part, "Due to the severity of these infractions, I have no other recourse than to terminate your employment at the Panama City Police Department effective immediately." (Doc. 39, Ex. 1, p. 2932). In a separate letter sent to the Civil Service Board (CSB) CSB, dated February 10, 2005, the City indicated that Davis was terminated for violating the following General Orders: 415.00 [sic], 416.00, 426.00, and 411.00. (Id. at 1174). In a memorandum to the CSB, Chief Van Etten informed the Commission that Davis had been terminated for violated PCPD procedures and violated "Florida Statute 893." (Doc. 39, Exhibit 2, p. 2540-2541).

In an affidavit of separation sent to the Florida Department of Law Enforcement and dated March 10, 2005, Chief Van Etten indicated that Davis was terminated because "during a routine vehicle inspection, cocaine residue was found in the officer's personal shaving kit located in the front passenger seat of his police vehicle. The residue was sent to FDLE lab which confirmed the substance was cocaine." (Id. at 1178). In addition, the box on the affidavit form stating "Terminated for violation of Section 943.13(4) F.S., or violation of moral character standards as defined by Rule 11B-27.0011, F.A.C" was checked. (Id. at 1177).

4

Davis admits that he failed to follow the General Orders in question, but contends that violating these General Orders did not rise to the level of a terminable offense. PCPD maintains that all of these offenses were terminable offenses pursuant to the Administrative Personnel Policies Manual for the City of Panama City, Florida. (Doc. 39, Exhibit 1, Part 11). On February 15, 2005, Davis submitted a letter to Panama City's CSB appealing his termination by the PCPD, stating in part, "I feel that the termination was unfair and unjust. If every officer were [sic] terminated for violations of General Orders there would be no officers in the Panama City Police Department." (Doc. 39, Ex.8). The CSB posted a public notice indicating that the appeal hearing would take place on March 17, 2005 and, in addition, sent Davis a notice of the hearing by  certified mail on March 9, 2005. The hearing took place as scheduled. When Davis did not appear at the hearing, the CSB contacted Davis by telephone, at which point Davis stated that he would not be attending the meeting. On April 5, 2005, the CSB issued a unanimous Final Order finding that "[t]here was competent evidence presented that Officer Davis violated [General Orders 416.00, 416.01, and 426.00]" and that Davis' termination "...was with cause and that there was competent, substantial evidence in support of this termination."[1] (Doc. 39, Exhibit 1, Part 11, p.1909).

On November 16, 2005, the FDLE Criminal Justice Standards and Training Commission (CJSTC) held a hearing to determine whether there was probable cause to support the City's claim that Davis possessed cocaine. The Commission is comprised of individuals that bear no relationship to the City of Panama City. Davis attended the hearing and testified under oath regarding the events leading to his eventual termination from the PCPD. Davis admitted that he had in fact violated the General Orders listed in his termination letter with respect to evidence collection. In addition, the City claims that Davis' recollection of the events that took place on the night he was provided with the cocaine in question differed from the account he provided the PCPD:

> And I explained to them that on my days off that I received these items

---

[1] It is worth noting that this matter was referred to the State Attorney's Office, but Davis was never formally charged or convicted of any crimes for cocaine in his possession.

from a friend that was my daughter's. She gave them to me to test, and I agreed that I would test these for her to give back to her because this young lady thought that maybe her boyfriend was actually doing drugs around her child. So I told them, I said, sure, I'll test them. I put it in my kit, and sure, from [sic] four days off, I forgot about them.

(Doc. 39, Exhibit 9, p. 1774 (lines 24-25), p.1775 (lines 1-7)). The identity of the "she" in Davis' statement is ambiguous. Later in his testimony, however, Davis clarifies the identify:

I was laying on the couch – like I told them at the time, I was laying back on the couch resting. I was in and out of sleep at the time. My daughter - - I did hear my daughter's voice. She said, daddy, will you test these for me. It's for a friend of mine. I could see the young lady. I didn't know who she was. I told them that.

(Doc. 39, Exhibit 9, p. 1778 (lines 17-24)).[2]  During Davis' deposition on November 1, 2006, he was again asked whether "he knew the name of the woman who actually gave you the baggy and straws in order to test." Davis replied, "No, sir." (Doc. 39, Exhibit 5, p. 11-12).

Davis disputes the City's contention that the "material facts of the testimony was a different sworn version of how the trace elements of the cocaine came into possession." Nonetheless, after Davis' testimony, the Commission unanimously found that there was probable cause to find that Davis was in possession of cocaine and filed an Administrative Complaint seeking to impose disciplinary action upon Davis for violating Fla. Stat. §§ 943.1395(6) and/or (7), and/or 943.13(7) and Rule 11B-27.0011(4)(a). Prior to the imposition of any penalty, Davis "voluntarily relinquished" his Law Enforcement Credential in July or August of 2006. (Doc. 39, Exhibit 5, p. 26, lines 4-9).

On February 13, 2005, Davis filed a charge of discrimination against the City with the Florida Commission on Human Relations (FCHR) in which he stated that he "was

---

[2] Adding to the confusion, Davis' Amended Complaint states that the straws and bags were given to him by "an unknown female police officer." (Doc. 14, Amended Complaint, ¶24).

6

unfairly terminated on February 9, 2005...based on my race...[w]hite officers have done worse things but they are not terminated. For example, a white officer raped a girl while on duty...he did not get terminated; he would later get promoted." (Doc. 39, Ex. 4A, p. 2177). On August 25, 2005, the FCHR sent Davis and PCPD a letter indicating that "...[FCHR] has determined that there is no reasonable cause to believe that an unlawful employment practice occurred." (Id. at p.2168). Davis failed to request an administrative hearing within the 35 day time limit stated in the notice of determination letter. On November 21, 2005, the United States Equal Opportunity Commission closed Davis' file and issued a right to sue. After initially filing a Complaint on December 19, 2005, (Doc. 1) against the City, Davis filed an Amended Complaint (Doc. 14) on May 19, 2006 alleging unlawful termination based on race discrimination (disparate treatment and pattern and practice) and a racially hostile workplace that has caused him mental anguish. After setting out the summary judgment standard, the Court will address each of these claims in turn.

## II.  DISCUSSION
### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to

find for the nonmoving party." Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at 251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes,

398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

## B.  Race Discrimination

Davis claims that his termination by the City was racially motivated and discriminatory, violating Title VII (42 U.S.C. § 2000e et seq.) and 42 U.S.C § 1983. "Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under ... [section] 1983 , the legal elements of the claims are identical." Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir.1985); see also, Godoy v. Habersham County, 2006 WL 3592415, *2 (11th Cir. 2006)(holding that since "claims under Title VII and § 1983…have the same elements of proof and analytical framework" they can be discussed concurrently).[3] Title VII prohibits an employer from " discharg[ing] any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a). "The two theories of intentional discrimination under Title VII are disparate treatment discrimination and pattern or practice discrimination." Burke-Fowler v. Orange County,

---

[3] "Municipalities may only be held liable under section 1983 if  'action pursuant to official municipal policy of some nature caused a constitutional tort.'  Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 729, 109 S.Ct. 2702, 2719, 105 L.Ed.2d 598 (1989) (quoting Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). '[O]nly those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability.' City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion) (internal quotation omitted). Whether an official has final policymaking authority is a question of state law." Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994). It is the CSB, not the PCPD Chief, that has the final policymaking authority and since there is no evidence that the CSB has an "official municipal policy" or custom/practice that sanctions racial discrimination of any type, Davis' 1983 claim must fail. See e.g. Mandel v. Doe, 888 F.2d 783, 791 (11th Cir. 1989).  In fact, all of the statistical evidence submitted reveals quite the opposite. Nevertheless, as will be shown below, even if the PCPD Chief could be identified as the final decision maker, there is no evidence that he engaged in any actions that could be reasonably interpreted as racially discriminatory.

Fla., 447 F.3d 1319, 1322 (11th Cir. 2006). Davis alleges that he suffered discrimination under both theories of intentional discrimination, and as such, each of his claims will be analyzed in turn.

### i. Disparate Treatment

"Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence." E.E.O.C. v. Joe's Stone Crab, 220 F.3d 1263, 1286 (11th Cir. 2000). A prima facie claim of discrimination can be established three ways: 1) direct evidence; 2)circumstantial evidence; or 3) statistical proof. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.1990). Davis claims that there is direct and circumstantial evidence supporting his claims.

### a. Direct evidence

Davis states that he was "subjected to direct comments about his race."  (Doc. 14, Amended Complaint, ¶ 34).  Direct evidence of discrimination is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir.1987) (quoting Black's Law Dictionary 413 (5th ed.1979) (citation omitted and emphasis omitted)). "Direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir.1990) [citing Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir.1988); Thompkins v. Morris Brown College, 752 F.2d 558, 563 (11th Cir.1985); Dunning v. National Industries, Inc., 720 F.Supp. 924, 929 n. 6 (M.D.Ala.1989)]. " 'Only the most blatant remarks, whose intent could be nothing other than to discriminate...' will constitute direct evidence of discrimination." Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1359 (11th Cir.1999) [citing Early v. Champion Int'l Corp., 907 F.2d 1077, 1081-82 (11th Cir.1990) (citations omitted)].

Davis claims that several PCPD officers made racial remarks to him during his employment. For example, Davis claims that during his training period in 1999, he "had

to sit and listen to racial comments and so-called racial jokes." (Doc. 39, Exhibit 6, Part 2, p.2). For the most part, Davis does not reveal who made these comments, and while it may be reasonable to infer that they came from PCPD employees, in considering direct evidence of discrimination, a fact-finder must be able to accept such evidence without any inference or presumption. Davis does allege that his Field Training Officer (FTO) "made reference to black men as apes and black women as chimps" and apparently stated that "we [blacks] 'fuck' like apes and chimps." (Doc. 39, Exhibit 6, Part 2, p.6). Davis does not correlate the FTO's treatment to his termination or any other adverse effect upon the material terms of his employment.

Davis also alleges that in 2003, Lt. Clyde Arnold pulled Davis into his office and allegedly warned Davis to "watch his back because there are still a lot of 'closet Klans' employed with the PCPD and that if I ever need to talk or have a problem with white officers to come back and see him." (Doc. 39, Exhibit 6, Part 2, p.2).  While this comment provides evidence that there may have been racist officers employed by the PCPD during Davis' tenure of employment, Arnold's comment is not a "blatant remark" whose intent was to discriminate against Davis. Quite to the contrary, Lt. Arnold's remark supports the fact that the PCPD administration was willing to address any concerns Davis might have with any white officer. Davis also claims that Officer Brooks told Davis that "the Department is wasting money on Blacks and Orientals." (Doc. 39, Exhibit 6, Part 2, p.6). Davis provides no information as to the officer's position or when the comments took place. In addition, this officer is no longer employed with the PCPD. Davis also contends that "other officers" would routinely make racist statements such as "don't come in my neighborhood, we might have ropes for you." Id. Davis does not state when these comments occurred and which officers made them.

In addition, and perhaps more importantly, Davis does not allege that any of the officers who made racist remarks were in a position to alter the terms of his employment. In fact, many of Davis' claims do not identify when or who made the discriminatory comments. Because statements of discriminatory intent must be made by a person involved in the challenged decision to constitute direct evidence of discrimination, "remarks by non-decision makers or remarks unrelated to the decision-

making process itself are not direct evidence of discrimination." <u>Bass v. Bd. of County Comm'rs, Orange County, Fla</u>., 256 F.3d 1095,1105 (11th Cir.2001) (quotations and emphasis omitted). During the immediate time period preceding and during Davis' termination, Davis does not allege that any direct racial comments or actions took place.

Thus, despite the crude and unprofessional nature of the comments allegedly made to Davis in the years prior to his termination, none of these remarks bear any relationship - temporally or substantively - to Davis' termination and as such, no reasonable fact finder could determine that these comments demonstrated a direct discriminatory animus on the part of the PCPD that correlated with Davis' termination.

<u>b. Circumstantial Evidence</u>

Turning to the circumstantial evidence provided by Davis in alleging discrimination, the court must apply the three-tiered analysis set forth in <u>McDonnell Douglas</u> and refined in <u>Texas Dept. Of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981). <u>See</u> <u>Byrd v. Lakeshore Hosp.</u>, 30 F.3d 1380, 1383 (11th Cir.1994). Under the McDonnell Douglas analysis, a plaintiff is required to first establish, by a preponderance of the evidence, a prima facie case that creates a rebuttable presumption of unlawful discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. at 1824. "The plaintiff's burden of establishing a prima facie case serves, in part, to assure that the plaintiff has some competent proof that []he was treated differently than similarly situated employees." <u>Lang v. Star Herald</u>, 107 F.3d 1308, 1312 (8th Cir.1997). Second, if the plaintiff successfully establishes the prima facie case of discrimination, the burden of production "then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. at 1824. Finally, if the employer successfully articulates some legitimate, nondiscriminatory reason for the employee's rejection, the plaintiff must demonstrate by a preponderance of the evidence that the employer's stated reason for rejecting the employee was merely a pretext for discriminating against him. <u>Id</u>. at 804; 93 S.Ct. at 1825. Despite the shifting burdens of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253, 101 S.Ct. at 1093.

### aa. Prima Facie Case

Under the McDonnell Douglas framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally." McCalister v. Hillsborough County Sheriff 2006 WL 3741883, *2 (11th Cir. 2006). To establish a prima facie case of disparate treatment under this rubric, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. Maynard v. Bd. of Regents of the Div. of Univ. of Fla. Dep't of Educ, 342 F.3d 1281, 1287 (11th Cir.2003); see also, Ivey v. Paulson, 2007 WL 216284, *2 (11th Cir. 2007); see also, E.E.O.C. v. Joe's Stone Crab, 220 F.3d 1263, 1286 (11th Cir. 2000). Davis has satisfied his obligations under this standard and established a prima facie case of discrimination.

Davis provides four examples of disparate treatment that took place during his tenure with the PCPD from 1999-2005 in order to prove that the City's actions were motivated by race: 1) In 1999, racial comments and "so-called racial jokes" were made during Davis' training period in 1999; 2) in 2003, a PCPD Lieutenant told Davis to "watch his back because there were still a lot of 'closet Klans' still employed by the PCPD; 3) in 2004, Davis was disciplined for not backing up a call while a white officer who also failed to backup the same call did not receive any discipline; and 4) in 2005, Davis was terminated for violating PCPD rules while similarly situated white officers did not face the same ramifications.

First, it is clear that Davis belongs to a protected class (African Americans). Second, Davis was qualified for the position from which he was terminated, namely an officer with the PCPD. The Eleventh Circuit has held that " …if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position." Damon v. Fleming Supermarkets of Fla., 196 F.3d 1354, 1360 (11th

Cir. 1999); <u>Pace v. Southern Railway System</u>, 701 F.2d 1383, 1386 n. 7 (11th Cir.1983) (finding that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy a prima facie case, can be inferred"). Third, Davis' termination qualifies as an adverse job action. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, that deprives him or her of employment opportunities, or adversely affects his or her status as an employee." <u>Galloway v. Ga. Tech. Auth.</u>, 182 Fed.Appx. 877, (11th Cir.2006) (citing <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir.2000) (internal quotation marks and citation omitted)); <u>see also</u>, <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001). Fourth, the City admits that because a white officer filled Davis' position four months later, Davis has indeed fulfilled the requirements necessary to establish a prima facie case of discrimination.

It is worth noting that the City "assumes" that Davis satisfies the requirements necessary to establish a prima facie case; however, it only concedes this issue on the basis that Davis suffered an adverse job action when he was terminated. The City claims, and the Court agrees, that since Davis' first three alleged incidents of discrimination did not result in any material change in the terms, conditions, or privileges of his employment, they would not qualify as adverse job actions.

### bb. Employer's Legitimate Nondiscriminatory Reason

Because Davis has established a prima facie case for discriminatory discharge, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for terminating Davis. In showing that it had a legitimate, nondiscriminatory reason for terminating an employee, the defendant's burden is "exceedingly light." <u>Perryman v. Johnson Prods. Co. Inc.</u>, 698 F.2d 1138, 1142 (11th Cir.1983) (citing <u>Burdine</u>, 450 U.S. at 254-55, 101 S.Ct. at 1094). "The defendant only needs to produce evidence of a reason for its decision; it does not need to prove that it was actually motivated by that explanation." <u>Sermons v. Fleetwood Homes of Georgia</u>, 227 F.Supp.2d 1368, 1380 (citing <u>Burdine</u>, 450 U.S. at 254, 101 S.Ct. at 1094). "[The proffered reason] is sufficient

if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." <u>Burdine</u> 450 U.S. at 254-55, 101 S.Ct. at 1094. The defendant's burden at this stage of the analysis is "merely one of production, not of proof." <u>Lee v. Russell County Bd. of Educ.</u>, 684 F.2d 769, 773 (11th Cir.1982). "As long as the defendant articulates its reason with some specificity so that the plaintiff has a 'full and fair opportunity to demonstrate pretext,' the defendant's burden has been met." <u>Sermons</u>, 227 F.Supp.2d at 1380 (quoting <u>Burdine</u>, 450 U.S. at 255-56, 101 S.Ct. at 1095).

The City has satisfied its burden of articulating a legitimate, nondiscriminatory reason for terminating Davis. As stated in the facts section above, the City claims that Davis was terminated because he violated the law and the PCPD's policies. While Davis may have violated Florida law, Davis' termination letter makes no mention of this, and thus, the Court's analysis is restricted to Davis' violation of PCPD policies. Davis admits that he violated PCPD policies and admits that the Chief has discretionary authority to discipline employees for violations of policy. This is sufficient to meet the City's "exceedingly light" burden.


cc. Pretext

Once a defendant offers a legitimate, nondiscriminatory reason for its actions, the plaintiff must attack that reason 'head on and rebut it' so as to show that the reason is really pretext for discrimination." <u>Sermons</u>, 227 F.Supp.2d at 1381 ( quoting <u>Chapman v. Al Transport</u>, 229 F.3d 1012, 1030 (11th Cir.2000)). Pretext can be established by evidence which "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.' " <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir.1994). Stated differently, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' " <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) (quoting <u>Burdine</u>, 450 U.S. at 256, 101 S.Ct. at 1095). The proffered explanation is unworthy of belief if the plaintiff

15

demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder" could disbelieve it. Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir.1997) (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.1996)) (citation and internal quotation marks omitted). In order to prove pretext, the plaintiff may offer "direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence." Woody v. St. Clair County Comm'n, 885 F.2d 1557, 1560 (11th Cir.1989) ( citing Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir.1985)). The plaintiff may also establish pretext by showing that the employer did not rely on the proffered explanations for its actions. See Israel v. Sonic-Montgomery FLM, Inc., 231 F.Supp.2d 1156, 1162 (M.D.Ala.2002) (citing Chapman, 229 F.3d at 1024). Davis does not meet his burden of establishing that a reasonable trier of the facts could find the City's explanation for terminating Davis to be pretextual.

Davis admits that he violated the PCPD policies in question; nevertheless, he claims that the City's explanation for terminating him was pretextual. Davis alleges that he can demonstrate pretext in three ways:  1) There are similar comparators that were not disciplined as severely as Davis; 2) the City did not follow its own procedures in terminating Davis; and 3) the City changed its rationale for why it terminated him.

In terms of comparators, when initially questioned by the City, Davis submitted that the following white officers as proper comparators that were charged with violating the PCPD's policies and procedures without facing discharge: Officer Nick VanStrander, "other officers", Officer James Hines, Officer Kevin Miller, "the whole [p]olice [d]epartment", and Chief Van Etten. Subsequently, in response to the City's Motion for Summary Judgment, Davis submits the following additional comparators: Officers Atwell, Crawford, Philips, Clemmons, Entrekin, Hicks, and Shramek. In response to this Court's order at the pre-trial conference (Doc. 61), Davis submitted the following additional comparators: Officers Romans, Randall, Yates, Hicks,  Langston, and Hartwell. The City argues that there is no evidence that any officers outside of the protected class were treated any differently than Davis.

In terms of evaluating which comparators are "similarly situated," the 11th Circuit instructs:

> When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999) (citations and quotation marks omitted). When making that determination, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

Burke Fowler v. Orange County, Fla, 447 F.3d 1319, 1323 (11th Cir. 2006)[citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir.1984) (requiring a plaintiff bringing a discriminatory discipline claim to show "that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained") (citations, quotation marks, and alterations omitted)]. "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Jones v. Bessemer Carraway Med. Ctr.,137 F.3d 1306, 1311 (11th Cir.1998), (internal quotations and citations omitted); see also, Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989)  ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples"). Further, it is the plaintiff's burden, not the defendant's, to prove that employees are similarly situated and were not treated equally. Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir.1989) (citations omitted). Based on this standard, the Court finds that none of the comparators cited by Davis are proper and as a result, his argument must fail.

While Davis cites to several "comparators," he relies most heavily on the treatment of one officer in particular, Nick VanStrander. In response to the City's first interrogatories, Davis contends that VanStrander actually raped the citizen question, made a false arrest while intoxicated, and purchased crack cocaine from a black male

prior to arresting him.[4] (Doc. 39, Exhibit 6, Part 2). Nevertheless, he was only disciplined with a 28 day suspension in lieu termination. The City provides five reasons why VanStrander is not a proper comparator: 1) The allegations involving VanStrander did not involve drugs; 2) Despite the serious nature of the allegations against VanStrader, the infractions were not the same; 3) No rape was ever substantiated because the citizen who filed the complaint against VanStrander chose not to pursue the matter; 4) The disciplinary histories of the two officers are different; and 5) Different decision makers were involved.  Davis does not provide any evidence that VanStrander ever committed the crimes he alleges. In addition, while both officers were not criminally prosecuted, it is undisputed that the disciplinary histories of the two officers are different as were the infractions under which each was disciplined. Finally, Chief Van Etten, who was Deputy Chief at the time of VanStrander's alleged rape, states that he would have fired VanStrander. These distinctions are critical; the misconduct of the comparator must be "nearly identical" in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." As a result, VanStrader is not a proper comparator in this case.

Davis alleges that another proper comparator is Officer Atwell. Atwell missed the same call that Davis was written up for in 2004, but was not written up by his supervisor. Davis himself provides the reason for why the difference in treatment:

> I told [my supervisor] that I did not hear the call. He then told me that he was going to write me up next time.  I told him that if he was going to write me up then he may as well write the whole squad up. I then stated that everyone misses calls from time to time. At this point he got very angry and told me to meet him in his office.

(Doc. 39, Ex. 4, p.2213). Davis' own recitation of the events indicates that his supervisor was only going to give him a verbal warning for missing the call until Davis became angry and provoked him with a sarcastic retort. In addition, a week after Davis was fired, Atwell was written up for violating one of the same policies as Davis, namely General

---

[4] In his Response, Davis alleges that VanStrander, a white officer, was accused of raping a citizen and received only counseling for it.

Order 416.00. Atwell received counseling for violating this infraction. While both Atwell and Davis were cited for violating General Order 416.00, Atwell was specifically cited for failure to turn in a car bumper collected as evidence in a prompt fashion. On the other hand, Davis was sanctioned for failing to turn in cocaine, a marked difference. Thus, it is clear that the cases of Atwell and Davis can clearly be distinguished. The remaining officers that Davis sets out are not proper comparators and can be distinguished on similar grounds – e.g. they violated different policies, their prior disciplinary histories with the department differed, etc.

Second, Davis claims that the City did not terminate him according to the "normal way of doing things."[5] (Doc. 43, p. 17). In reviewing Davis' contention, it must be noted that the Eleventh Circuit has specifically held that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions."  Davis v. Town of Lake Park, Fla, 245 F.3d 1232, 1244 (11th Cir. 2001). Specifically, Davis states that while the investigation against VanStrander was completed,  his was abandoned prior to its completion. The differing treatment can be justified on the basis that Davis admitted to violating the policies in question and as such, there was no reason to continue the investigation any further. Davis also argues that the City has failed to fix reasonably objective criteria for terminating an officer. It is true that "[w]hen the record establishes that no objective criteria was applied in an employer's decisionmaking process... similarly situated evidence is particularly relevant because inferences of discriminatory motive depend upon the application of subjective criteria." Anderson v. WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001). First, the City has an Administrative Personnel Policies Manual for the City of Panama City, Florida. (Doc. 39, Exhibit 1, Part 11) that provides examples of what actions may constitute grounds for termination, including "incompetency, carelessness or negligence in the performance of duty." (Id. at p. 2360.) In addition, it is undisputed that the PCPD Chief has discretion in deciding what level of discipline to impose upon officers for violating PCPD policies.

---

[5]The Court notes the apparent inconsistency in Davis' contention that he was not terminated according to the "normal way of doing things" and his contention that the City had failed to fix reasonably objective criteria for terminating police officers.

Based on the evidence in the record, it is clear that Davis has not submitted any evidence indicating that this discretion has been utilized by the PCPD Chief in an arbitrary or discriminatory manner. As stated above, all of the comparators Davis cited can be easily distinguished on a number of grounds and in addition, unlike <u>Anderson</u>, in which the plaintiff was terminated for "unprofessional behavior," Davis was terminated for violating very specific PCPD policies. As a result, this claim must fail as well. Finally, Davis alleges that the City failed to follow its anti-drug policy which required it to return Davis back to work upon his testing negative for drugs. This argument does not have merit because Davis was not suspended solely because he may have been taking drugs, but rather because he also failed to follow certain policies and procedures of the PCPD. The drug testing was simply a logical step to take in investigating Davis' overall situation. Thus, this argument must fail as well.

Third, Davis claims that the fact that the City changed its rationale for why it terminated him. The City admits that the termination letter given to Davis did not allege violations of any Florida statutes, while its subsequent contacts with the FDLE and the CSB indicated that Davis was terminated for violating certain Florida statutes. However, the Chief's communication with the CSB also indicated that Davis had violated PCPD procedures (Doc. 39, Ex. 2, p.2540), and the affidavit of separation submitted to FDLE provides all of the relevant information regarding his termination, although it does not explicitly state that Davis violated certain PCPD policies and procedures.(Doc. 39, Ex. 1, p.1178). As a result, the City explains (and the Court agrees) that its rationale for firing Davis never wavered. The underlying reason for firing Davis was the fact that cocaine was found in Davis' car, and that is what the termination letter and subsequent contacts with the FDLE and the CSB indicated. The fact that the City eventually concluded that violating these provisions also violated certain Florida statutes after Davis' termination is not inconsistent with the City's initial reasons for firing Davis and as a result, does not demonstrate any pretext on the part of the City.

c. Pattern and Practice

Davis also claims that there was a pattern and practice of the City applying work place policies and procedures with white employees receiving preferential treatment which resulted in a situation in which "blacks cannot succeed in the Police Department the same as whites in the terms and conditions of employment, including, but not limited to job security, advancement, and longevity." (Doc. 14, Amended Complaint, ¶ 40). In order to show that there was a pattern and practice, the following standard is applicable:

> In contrast, a pattern and practice claim either may be brought...[if there "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice" of discrimination, 42 U.S.C. § 2000e-6(a) (1994); see also In re Employment, 198 F.3d at 1310 n. 8, or by a class of private plaintiffs under 42 U.S.C. § 2000e, et. seq., see Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1549 (11th Cir.1986). In such suits, the plaintiffs must establish " 'that [ ] discrimination was the company's standard operating procedure.' " Cox, 784 F.2d at 1559 (quoting Teamsters, 431 U.S. at 336, 97 S.Ct. 1843); see also Franks v. Bowman Transportation Co., 424 U.S. 747, 772, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). To meet this burden of proof, a plaintiff must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that [ ] discrimination [is] the company's standard operating procedure-the regular rather than unusual practice." Teamsters, 431 U.S. at 336, 97 S.Ct. 1843 (footnote and internal quotation marks omitted). While "pattern or practice cases are a variant of the disparate treatment theory and thus '[p]roof of discriminatory motive is critical,' " statistical evidence often is used to establish the existence of a pattern or practice. Lujan v. Franklin County Bd. of Educ., 766 F.2d 917, 929 (6th Cir.1985) (quoting Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. 1843). A plaintiff may establish a pattern or practice claim "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." Mozee v. American Commercial Marine Service Co., 940 F.2d 1036, 1051 (7th Cir.1991) We also point out that "direct evidence of an intent to discriminate" may be used to establish a pattern or practice claim. Lujan, 766 F.2d at 929 n. 15. Finally, we observe that in determining pattern or practice liability, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a prima facie case that such a policy existed.

E.E.O.C. v. Joe's Stone Crab, 220 F.3d 1263, 1286-87 (11th Cir. 2000). As stated

previously, Davis has not provided the Court with any direct evidence of the City's intent to discriminate. While Davis does provide anecdotal evidence of isolated incidents that occurred during his employment with the PCPD, Davis has not provided any statistical evidence, much less strong statistical evidence, that racial discrimination of any type was the City's standard operating procedure. The City on the other hand, has provided the Court with detailed statistical evidence indicating that there is no minority underutilization in the protective services area. (Doc. 39, Ex. 3, Part 2, p. 2427).

In his letter to the FCHR, Davis cites to several instances which he claims support his position that blacks are treated less favorably than whites at the PCPD. However, the majority of the examples Davis provides do not include a date or time when the alleged incidents took place and are full of conclusory statements - e.g. "A black officer receiving stripes is unheard of." (Doc. 39 Exhibit 4, pg. 2214.) In addition, one of Davis' examples of racial discrimination actually seems to indicate that the PCPD administration was making a concerted effort to ensure that any acts of racial discrimination were addressed as soon as possible – i.e. Lt. Arnold's comment asking Davis to speak to him if any white employee gave him problems.

## C. Hostile Work Environment

Davis claims that racial comments "permeated the work place atmosphere in the Panama City Police Department" causing him "much mental anguish." It is clear that Davis cannot succeed on this claim.  In order to succeed on a claim for hostile work environment a plaintiff must satisfy the following elements

> 'A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.2002) (internal quotations omitted). 'In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.' Id. at 1276.

22

> Moreover, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citation omitted).

<u>Galloway v. Ga. Tech. Auth.</u>, 182 Fed.Appx. 877, 882 (11th Cir.2006). In addition, "[t]he employee must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions. <u>Godoy v. Habersham County</u>, 2006 WL 3592415, *2 (11th Cir. 2006) (<u>citing</u> <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081 (11th Cir.1990)).

While the instances alleged by Davis (see pages 10-11) are despicable, no reasonable fact finder could determine those actions and statements were sufficiently pervasive to alter the conditions of Davis' employment and create an abusive working environment. The actions Davis complained of predominantly occurred during his training period in 1999, with isolated incidents occurring in subsequent years. Because many of those allegations are not supported by any evidence indicating who made the statement or when the statement was made, it is difficult to accurately assess just how frequently such conduct occurred. Davis does not allege that any of the conduct was physically threatening, though one could reasonably infer that some of the comments were humiliating. Overall, however, these incidents were sporadic and isolated, and there is no evidence these incidents, looked at in a light most favorable to Davis, materially altered the terms and conditions of Davis' employment.

## D. Retaliation

Before addressing the substance of Davis' retaliation claim, it is necessary to address whether Davis complied with the notice pleading requirements of the Federal Rules of Civil Procedure and the administrative exhaustion requirements required by Title VII. Specifically, the City contends that Davis has not plead retaliation in his Amended Complaint nor did he allege retaliation in his FCHR charge.

The Federal Rules of Civil Procedure "impose a relatively lenient obligation upon pleaders in federal court... [a] pleader generally meets this obligation by notifying the

opponent of the claim and proposed relief to such a degree that the opponent is able to formulate a response." Federal Practice and Procedure (Quick Reference Guide), pg. 137 (2006) citing Hamilton v. Allen Bradley Co., 217 F.3d 1321 (11th Cir. 2000) vacated and superseded (holding "Detail is not the bedrock on which a proper complaint stands; all that is required is that the defendant be put on notice of the claim being asserted against it and the ground on which it rests"). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." Hamilton v. Allen-Bradley Co., 244 F.3d 819, 823 (11th Cir. 2000).

The closest Davis comes to setting out a claim for retaliation in the Amended Complaint appears in paragraph 36:

> Plaintiff alleges that he has subsequently applied for work with the Florida State Police and because of his unlawful termination from the Panama City Police Department, he has been unable to continue his career in law enforcement.

The City maintains that the only place Davis mentions retaliation was during his deposition and in response to an interrogatory. Davis does not respond to either of the City's claims in any detail.

Even with the most liberal of construction, it is difficult to fathom that the Plaintiff's statement in paragraph 36 of the Amended Complaint provides notice to the City that Davis is pursuing a retaliation claim. In addition, there is nothing in Davis' Amended Complaint indicating that he is seeking damages for retaliation. Even if Davis' Amended Complaint could be construed to provide notice to the City of its intent to seek relief and damages for retaliation, Davis would still have to comply with the administrative exhaustion requirements for Title VII claims for the Court to have proper jurisdiction over this claim. According to the Eleventh Circuit:

> The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation. See Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985). No action alleging a violation of Title VII may be

> brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge. <u>See generally</u> 42 U.S.C. § 2000e-5. EEOC regulations provide that charges should contain, among other things, '[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices.' 29 C.F.R. § 1601.12(a)(3). A 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' <u>Mulhall v. Advance Security, Inc.</u>, 19 F.3d 586, 589 n. 8 (11th Cir.1994) (citing <u>Sanchez v. Standard Brands, Inc.</u>, 431 F.2d 455 (5th Cir.1970)).

<u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1332 (11th Cir. 2000). Davis has not submitted any evidence articulating why he could not have made the retaliation claim (or elements thereof) in his FCHR charge or demonstrated how the investigation into his FCHR charge could have reasonably grown to include a possible claim for retaliation. As such, even if Davis did properly allege his claim for retaliation in his Amended Complaint, it would have been improper for this Court to consider the claim.[6]

### E. Conclusion

1. The City's Motion for Summary Judgment (Doc. 37) is granted.

2. The clerk shall enter judgment dismissing Davis' claims with prejudice.

3. The clerk shall close the file.

---

[6] Finally, even if Davis had complied with the administrative exhaustion requirements and plead his claim properly in his Amended Complaint, his retaliation claim would have failed because he does not allege the elements necessary to establish a prima facie case. See e.g. <u>Farley v. Nationwide Mutual Insurance, Co.</u>, 197 F.3d 1322, 1336 (11th Cir. 1999)(holding that in order to establish a prima facie case of retaliation, plaintiff must demonstrate that 1) he was engaged in a statutorily protected activity, 2) he was subjected to an adverse employment action, and 3) the adverse employment action was causally related to his protected activities). Davis does not identify what statutorily protected activity he was engaging and provides no relevant evidence that he was subjected to an adverse employment action.

**ORDERED** on February 13, 2007.

**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**